UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAMIEN SHONTELL HEWLETT,

      Plaintiff,

    v.                                                                   Case No. 25-C-1701

RANDALL HEPP,
LINDA MEISNER,
EMILY PROPSEN,
ANDREA BLEECKER,
YANA PUSICH,
CASEY SCHMUDE,
PAMELA JOHNSON, and
SARAH COOPER,

      Defendants.

## SCREENING ORDER

      Plaintiff Damien Hewlett, who is currently serving a state prison sentence at Waupun Correctional Institution and representing himself, filed a complaint under 42 U.S.C. §1983, alleging that his civil rights were violated. On December 30, 2025, the Court screened the complaint and after concluding that it contained unrelated claims against different sets of Defendants, gave Hewlett the opportunity to file an amended complaint containing only related claims. Hewlett filed an amended complaint on February 3, 2026, which the Court will screen, as required by 28 U.S.C. §1915A.

### SCREENING OF THE AMENDED COMPLAINT

      The Court has a duty to review any complaint in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity, and dismiss any complaint or portion thereof if the prisoner has raised any claims that are legally "frivolous or malicious,"

that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b). In screening a complaint, the Court must determine whether the complaint complies with the Federal Rules of Civil Procedure and states at least plausible claims for which relief may be granted. To state a cognizable claim under the federal notice pleading system, a plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It must be at least sufficient to provide notice to each defendant of what he or she is accused of doing, as well as when and where the alleged actions or inactions occurred, and the nature and extent of any damage or injury the actions or inactions caused.

"The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. "[T]he complaint's allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (internal quotations omitted).

### ALLEGATIONS OF THE AMENDED COMPLAINT

According to Hewlett, the water at Waupun Correctional Institution contains dangerous levels of radium. Hewlett explains that, at some unspecified time, inmates were informed via

2

memo that the radium levels in the water were safe for long-term consumption, but Hewlett believes those assurances are untrue. Inmates also were warned that long-term consumption of high levels of radium can lead to cancer. Hewlett asserts that inmates were *not* informed of other potential health risks, such as vision impairment, cataracts, blood disorders, anemia, reduced bone growth, broken teeth, and cavities. According to Hewlett, there was a vast conspiracy between high-ranking Department of Corrections officials to downplay the seriousness of the risks the inmates face from the water.

Hewlett asserts that once he learned the scope of the water conspiracy, he became paranoid about his health. He noted that he was frequently constipated and that his vision was deteriorating. He also asserts that his teeth began to randomly break, and he developed cavities. Hewlett does not clarify when these "symptoms" developed, but on November 18, 2022, he asked that his blood be tested for radium and that he receive a cancer screening. Defendant Nurse Andrea Bleecker responded that the radium levels in the water are safe and that there would be no long-term effects from drinking the water. Hewlett asserts that he was not triaged or scheduled to see a provider.

Nearly two years later, on July 26, 2024, Hewlett asserts that he discovered that Bleecker had "lied" when she told him the drinking water was safe for long-term consumption. He does not explain the basis for his "discovery." Hewlett asserts that he complained to the health services manager about not having received a blood test or cancer screening "to ensure [his] health and safety." According to Hewlett, after he complained, Bleecker began to retaliate against him by denying him treatment for his complaints of severe abdominal pain. He asserts that he noticed that his medical file contained two sets of instructions for care following a colonoscopy even though he had never received a colonoscopy. (Hewlett clarifies he is not pursuing a claim in connection with these missing procedures.) Hewlett asserts that on March 10, 2025, he wrote to the health

services manager about the missing procedures and informed her that he was still having severe abdominal pain. A few days later, Hewlett's health services complaint was referred to nursing.

On March 17, 2025, Bleecker and an officer came to Hewlett's cell and asked him if he wanted to be seen for his complaints of severe abdominal pain. Hewlett asserts that he informed Bleecker that he did want to be seen, but because she had lied in his medical records and in a conduct report, he preferred to be seen by a different nurse. Hewlett asserts that Bleecker then informed him he would not be seen and walked away. Hewlett asserts that he again wrote to Bleecker's boss to complain. The next day, he was again referred to nursing. Hewlett explains that when he arrived, he informed Bleecker that he had complained to her supervisor about her refusal to examine him the day before. Bleecker allegedly stated, "I know, but we're not going to talk about that, and if you bring it up again then your appointment will be cancelled and you'll be sent back to your cell, because I'm not going to tolerate your disrespectful, disruptive behavior with those allegations." Hewlett asserts that he responded, "So you [are] willing to violate your own N 7.03 Board of Nursing rules and deny me treatment for exerting my freedom of speech," to which Bleecker allegedly responded, "One more word and you can go back to your cell."

Rather than following Bleecker's instruction to stop talking about the prior day and to focus on the symptoms for which he was being examined, Hewlett turned to the officer and asked if he had ever heard of the N 7.03 Wisconsin Board of Nursing rules. Hewlett asserts that the officer did not have a chance to respond because Bleecker interrupted and said, "That's it, you can go back to your cell." Hewlett asserts that she then cancelled his appointment without examining him or providing any treatment. Hewlett states that on the way back to his cell, he and the officer agreed that he had not been disrespectful or disruptive.

4

Hewlett states that, over the ten years he has been incarcerated, his vision has deteriorated and he has had many cavities. He believes this is because of the radium in the water. He acknowledges that he has been "paranoid, worried, and in a constant state of fear" that he is going to get cancer. He states that he has been on many water strikes due to "paranoia" about the water.

## THE COURT'S ANALYSIS

Hewlett disregarded the Court's conclusion in the original screening order that claims against high-ranking Department of Corrections officials based on the radium levels in the water are not properly joined with claims against medical providers responding to specific complaints about his health conditions. This is because claims related to water quality and claims related to Hewlett's medical treatment do not arise out of the same transaction or occurrence and do not share common questions of law or fact. Accordingly, the claims belong in different cases. *See George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). The Court will therefore "drop" Randall Hepp, Linda Meisner, Emily Propsen, Yana Pusich, Casey Schmude, Pamela Johnson, and Sarah Cooper from this action. *See* Fed. R. Civ. P. 21 (giving courts the power to "drop a party" that is not properly joined in an action). Hewlett's claims based on allegations that high-ranking Department of Corrections officials engaged in a conspiracy regarding the water quality and failed to adequately warn him of the risks associated with long-term consumption of high levels of radium appear to be conclusory and speculative. But if Hewlett wants to pursue them, he must do so in a separate case.

Most of Hewlett's amended complaint focuses on his interactions with Bleecker, who he alleges retaliated against him and deprived him of adequate medical care when she refused his request for a blood test and cancer screening, ended one visit after he told her he did not want her to examine him, and ended another visit after he refused to follow her instructions and focus on

the purpose of the visit. Under the Eighth Amendment, "prison officials must take reasonable measures to ensure an inmate's safety." *Christopher v. Buss*, 384 F.3d 879, 882 (7th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "To state a claim premised on prison officials' failure to protect him from harm, [a plaintiff] must allege that the defendants knew of and disregarded an 'excessive risk' to his 'health and safety.'" *Id*. (citing *Farmer*, 511 U.S. at 837). Courts evaluate the risk an inmate faces on an objective basis; that is, "the allegedly dangerous prison condition must deprive an inmate of the 'minimal civilized measures of life's necessities.'" *Id*. (citing *Farmer*, 511 U.S. at 834).

Hewlett fails to state a deliberate indifference claim against Bleecker for a number of reasons. First, the Court cannot conclude that he faced an "excessive risk" to his health and safety. Hewlett explains that he had been experiencing stomach pains for years with bowel movements only three to five times per week. He also explains that he had gone on many "water strikes," suggesting that dehydration may have been contributing to his issues. Nothing suggests that Hewlett's stomach aches and mild constipation was an objectively serious condition that required immediate treatment.

Moreover, the Court cannot reasonably infer that Bleecker was deliberately indifferent to his complaints. The Eighth Amendment does not require that prisoners receive "unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Rather, they are entitled to only "adequate medical care." *Boyce v. Moore*, 314 F.3d 884, 888–89 (7th Cir. 2002); *see also Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [the plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). With regard to Hewlett's demand for a blood test and cancer screening, nothing in the amended complaint suggests that

Hewlett was experiencing any symptoms that would warrant such tests. Hewlett acknowledges that he became "paranoid" that he was being harmed by radium in the water, but his paranoia did not require Bleecker to pursue expensive diagnostic tests simply because Hewlett demanded them.

Also, with regard to the two appointments that Bleecker terminated, the only reasonable inference is that Bleecker refused to evaluate Hewlett *not* because she was deliberately indifferent to his medical condition but because Hewlett refused to cooperate. With the first visit, Bleecker asked Hewlett if he wanted to be examined. He said yes, but not by her. She ended the evaluation. As noted, Hewlett was not entitled to demand specific care or care by a specific provider. Bleecker offered to evaluate him, and he refused. He bears the consequences for that refusal. Similarly, with the second appointment, Bleecker warned him not to bring up his complaints about their interaction from the day before. Instead of following this instruction and focusing on his medical condition, he antagonized Bleecker by implying directly to her and to the officer in the room that she was not doing her job appropriately. Her decision to terminate the evaluation after Hewlett repeatedly disregarded her instructions to focus on his medical condition is an appropriate enforcement of boundaries, not a demonstration of deliberate indifference. Bleecker was not required under the Constitution to indulge Hewlett's antics. *See Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009).

In any event, it does not appear that Hewlett suffered any harm from a short delay in being evaluated. Hewlett's complaints of stomach pain were long-standing and likely, at least in part, the result of his own decision not to drink water. Hewlett was always able to submit another health services request, and nothing suggests that Bleecker knew that a short delay in evaluating Hewlett "would needlessly and substantially prolong a dangerous medical condition." *See Burton v.*

7

*Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Hewlett therefore fails to state an Eighth Amendment claim against Bleecker.

Hewlett also fails to state a retaliation claim against Bleecker. To plead a retaliation claim, Hewlett needed to allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). Although Hewlett arguably satisfies the first and second prongs of the standard, the Court cannot reasonably infer that he satisfies the third prong. As noted above, the only reasonable inference is that Bleecker ended her first visit with Hewlett because he stated that he did not want to be evaluated by her, and she ended the second visit because he refused to follow her directions to focus on the reason for the appointment and to stop talking about topics unrelated to his health condition. In short, even construing the allegations broadly, nothing suggests that Bleecker refused to evaluate Hewlett because he had complained about her to her supervisor. Hewlett therefore also fails to state a retaliation claim against Bleecker.

**IT IS THEREFORE ORDERED** Randall Hepp, Linda Meisner, Emily Propsen, Yana Pusich, Casey Schmude, Pamela Johnson, and Sarah Cooper are **DROPPED** from this action pursuant to Fed. R. Civ. P. 21 because they are not properly joined in this action.

**IT IS FURTHER ORDERED** that this action is **DISMISSED** pursuant to 28 U.S.C. §§1915(e)(2)(B) and 1915A(b)(1) for failure to state a claim.

**IT IS FURTHER ORDERED** that the Clerk of Court document that this inmate has incurred a "strike" under 28 U.S.C. §1915(g).

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Green Bay, Wisconsin this 25th day of February, 2026.

_____
William C. Griesbach
United States District Judge

---

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.